**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **CRIMINAL ACTION NO.** |
| **Plaintiff,** | **1:19-CR-76-LMM-CCB** |
| **v.** | |
| **JOSEPH DOMINIC EDWARDS,** | |
| **Defendant.** | |

## FINAL REPORT AND RECOMMENDATION

Defendant Joseph Dominic Edwards is charged in a second superseding indictment with conspiring to possess with the intent to distribute methamphetamine, heroin, and fentanyl (Count 1); possessing with the intent to distribute methamphetamine (Count 7); possessing a firearm in furtherance of a drug-trafficking crime (Count 8); and possessing a firearm after having been convicted of a felony (Count 9). (Doc. 393). He filed a motion to suppress evidence seized from a warrantless search of a car in which he was a passenger, (Doc. 317), and a motion to suppress statements that he made to law enforcement, (Doc. 318). The Court held an evidentiary hearing, (Doc. 868), and the parties have filed post-hearing briefs, (Docs. 907, 920). For the reasons set forth below, the undersigned

**RECOMMENDS** that Defendant's motion to suppress evidence, (Doc. 317), be **DENIED** and that Defendant's motion to suppress statements he made to Investigator Santa, (Doc. 318), be **GRANTED**.

## I.    Facts

### A.    Events Leading Up to the Traffic Stop

Defendant's motions relate to a traffic stop that occurred on November 29, 2018. That stop arises out of a DEA investigation that began in August of 2018. (Doc. 868 at 7). By November of 2018 agents had identified a stash house on Old White Mill Road ("the house"). *Id.* at 8. Specifically, agents intercepted communications indicating that a customer was going to pick up drugs at the house on November 14, 2018. *Id.* There was a pole camera in place on that date that allowed agents to see a vehicle arrive at the house, stay for approximately 35 minutes, and then leave. *Id.* at 8–9. Troopers with the Georgia State Patrol stopped the car shortly after it left Old White Mill Road, and they recovered approximately four kilograms of methamphetamine. *Id.* at 10. The person who picked up those drugs from the house is a defendant in this case. *Id.*

Fast forward several weeks. Agents intercepted wiretap communications between someone they then knew as Valencia (and now suspect to be defendant Salvador Valencia-Zavala) and an unknown male (who they now believe is

2

Defendant Edwards). *Id.* at 11.[1]  In those conversations, Valencia told the male that the male needed to bring $6,000 to pay off a debt and $32,000 for what he was picking up, and that the male would receive a total of eight kilograms of drugs. *Id.* at 11–12. Valencia sent a text message to the male with the address of the house. *Id.* at 12.

On November 29, 2018, a DEA task force officer observed a gray Toyota Camry turn onto Old White Mill Road, and approximately 20 seconds later (around 6:26 p.m.) the car appeared on the pole camera footage at the house. *Id.* at 13. Because it was dark, agents were not able to see who was in the car or identify who went into the house. *Id.* at 14. However, the same unknown male who was previously intercepted (who, again, agents now believe is Edwards) sent a text message to Valencia saying "I'm here." *Id.* at 14–15. Agents then intercepted calls between Juan Chavez and Emmanuel de Santos Nieto (both defendants in this case) where Chavez told Santos Nieto to count the money "and make sure that the 38 was there." *Id.* at 15, 24. Shortly thereafter, Santos Nieto told Chavez that "the one for 8 pantalonas had left." *Id.* at 15. DEA Special Agent Bryan Tice testified

---

[1] It is not entirely clear when these intercepted communications took place. The Government suggests in its brief that they occurred the day before the November 29 traffic stop. (Doc. 920 at 2–3).

that agents involved with this investigation identified "pantalonas" as a code word for one kilogram of methamphetamine. *Id.* Approximately 20 minutes after it arrived at the house, the gray Camry left the house. *Id.* at 14.

### B.    The Traffic Stop

Agents and state law enforcement officers maintained uninterrupted surveillance of the Camry from the time it left the house until it was stopped on the I-75/85 connector. (Doc. 868 at 16). Indeed, DEA agents had previously arranged to have the Georgia State Patrol (GSP) and Atlanta Police Department (APD) assist with the traffic stop. *Id.* at 13. Agents were in contact with GSP throughout the surveillance of the Camry—Agent Tice testified that "GSP would have known that the vehicle left. We would have given a description of the vehicle and the tag number of that vehicle, and its current location kind of…a play by play as we were conducting surveillance." *Id.* at 16. GSP Trooper Youngblood was one of the officers in the area, and he testified that he was in "fairly constant contact" with DEA during the event and was informed that the car was a gray or silver Toyota Camry. *Id.* at 33, 54. Youngblood observed that the license plate on the car was obscured, and he stopped the vehicle. *Id.* at 35–36. The stop was recorded by a camera in the trooper's car. *Id.* at 36.

4

Trooper Youngblood approached the passenger side of the car, asked for the driver's license (the driver was Ms. Young, Defendant was the passenger), and asked Ms. Young to step out of the car. (Gov. Exh. 10; Camera O, 2:17–2:33). The trooper and Ms. Young stood in front of his patrol car (and behind her car), he showed her the license plate, and he explained why he stopped her. *Id.* at 2:50–3:03. He then asked her where she was going (she said from Defendant's sister's house), where she lived, where Defendant's sister lived, and for Defendant's name. *Id.* at 3:03–3:24. The trooper went to his car to retrieve a pad. *Id.* at 3:24–3:36. He returned and told Ms. Young that as long as everything checked out, he would start writing his paperwork (at the hearing, he testified that he was going to give her a written warning). *Id.* at 3:36–3:42; Doc. 868 at 40.

The trooper engaged in conversation with Ms. Young about her travels while he wrote the warning. (Gov. Exh. 10; Camera O, 3:38–6:47). He asked her Defendant's name, Defendant's sister's name, how long they had been in Georgia (Ms. Young lives in South Carolina), why they came to Georgia, whether she was cold, where Defendant's sister lives, and how long she has been with the Defendant. *Id.* At one point during the conversation, another trooper, Doug Allen, joined the discussion. Trooper Youngblood explained to Trooper Allen what Ms. Young told him about her travels with Defendant. *Id.* at 6:00–6:08. Trooper Allen

5

then engaged in some conversation with Ms. Young about where she was driving. *Id.* at 6:25–6:35.

Trooper Youngblood went back to the passenger side of the car to ask Defendant for the registration. *Id.* at 6:46. While Defendant was looking for the registration, the trooper asked him where he was going, where he was coming from, why he went to see his sister, and how long he was there. *Id.* at 6:46–8:00. Defendant located an expired registration and spent some time looking for a current one. *Id.*

Trooper Youngblood returned to Ms. Young, resumed writing the warning, and asked her where Defendant's sister lives, whether there were any weapons or drugs in the car, and why she and Defendant gave different answers about where they were coming from. *Id.* at 8:30–10:14. He then went into his patrol car to run her information. *Id.* at 10:14–14:52. He returned and asked for consent to search the car, which she refused—indicating that it was not her vehicle. *Id.* at 15:00–15:41. The trooper then asked Defendant to step out of the car, frisked him, and told him that they were going to run Trooper Allen's canine around the car. *Id.* at 16:05–18:20. The dog performed the walk-around, indicated to the presence of drugs, and both Defendant and Ms. Young were placed in handcuffs. *Id.* at 18:20–22:15; Doc. 868 at 80. All told, it was slightly over 17 minutes from the time that Trooper

6

Youngblood turned on his blue lights to initiate the traffic stop until the time the dog began the search, ((Gov. Exh. 10; Camera O at 1:07–18:20), and four minutes more until Defendant was placed in handcuffs, *id.* at 18:20–22:15. Following the canine's alert, officers searched the car and found eight kilograms of methamphetamine, marijuana pipes, and a firearm. (Doc. 868 at 51, 82).

After the canine alerted to the presence of narcotics, Defendant was arrested and placed in an APD patrol car. *Id.* at 95–96. APD Investigator Santa read Defendant these warnings from a card that he had with him:

1. You have the right to remain silent.
2. Anything you say will be used in court as evidence against you.
3. You are entitled to have a lawyer now and have him present now or at anytime during questioning.
4. If you cannot afford a lawyer, one will be appointed for you without cost and he may be present at all times during your questioning.
5. You can decide at any time to exercise these rights and not answer any questions or make any statements.

*Id.* at 96–97; Gov. Exh. 12. Investigator Santa asked Defendant if he understood his rights, and Defendant said "yes." (Doc. 868 at 97). The investigator then asked Defendant if he wished to talk without a lawyer, and Defendant said, "I'll talk to you." *Id.*[2] There is no indication that Investigator Santa followed up with any

---

[2] It is not entirely clear whether Investigator Santa was wearing a body camera at the scene of the traffic stop. (Doc. 868 at 98–99, 110). On direct

actual questions at the scene of the traffic stop, and he testified that Defendant never invoked his right to silence or to have an attorney present. *Id.* at 97–98.

DEA Agent Gray was also on the scene, and he spoke to Defendant while Defendant was in the back of Investigator Santa's car. *Id.* at 123–26. Santa told Gray that Santa had already advised Defendant of his rights, so Gray did not do so again. *Id.* at 124. Gray asked Defendant if Defendant would talk to him, and Gray testified about what Defendant said in response: "he said that—just to paraphrase, I don't have the exact quote, but he was really didn't want to talk to me any more if we weren't going to let the girl go. I think he had made some sort of contingency on letting the girl go, but at no time did he say that he refused to talk to me, and he never asked for a lawyer in my presence." *Id.* After Defendant said that, Gray ended the conversation and walked away. *Id.* at 125.

---

examination, he was asked whether he had "a body cam on that day?" *Id.* at 98. He responded that "I did not have it during the traffic intervention." *Id.* When the AUSA followed up and asked "why didn't you have your body cam on or activate it at this point?" the investigator said "I did not turn it on on the scene." *Id.* at 98–99. On cross, defense counsel asked, "So you had a body cam on at the scene, at the scene of the traffic stop?" and Santa answered, "Yes." *Id.* at 110. Defense counsel followed up, "But you didn't activate it?" and Santa answered, "No." *Id.* Regardless of whether the investigator had his body camera with him at the scene, it is clear that he did not record the conversation wherein he gave Defendant the *Miranda* warnings. Nor did he use a written waiver form. *Id.* at 107–08.

8

Defendant and Ms. Young were eventually transported to an APD precinct. *Id.* at 102–03. There, Investigator Santa talked to both of them, who were each handcuffed to a bench. *Id.* at 103, 108. It is not exactly clear what time this interview occurred, but the investigator testified that he took Defendant to the precinct as soon as he cleared the scene of the traffic stop. *Id.* at 109. Santa testified that Defendant was "visibly distraught" and "very stressed out." *Id.* at 108–09. The video was recorded, and it shows that Investigator Santa approached Defendant (the investigator had been sitting in an adjoining room), asked him why he was so stressed out (noting that he could hear Defendant's teeth grinding), and asked whether Defendant wanted to talk to him. (Gov. Exh. 11 at 00:00–00:30). It is hard to hear Defendant on the video, but he appears to say, "I can't," to which the investigator responds, "You cannot?" and Defendant then twice says "I can't." *Id.* at 00:30–00:37. The investigator continues speaking to Defendant, he references the fact that Defendant was previously given his *Miranda* warnings and that Defendant was free to talk to him, and he offers the opinion that it is "probably" in Defendant's best interest to talk. *Id.* at 01:19–01:39. During the interview, at times Defendant just sat silently while the investigator and Ms. Young engaged in conversation, sometimes he simply ignored the investigator's question, sometimes Ms. Young answered questions posed to Defendant, and sometimes Defendant

answered the questions. During the conversation, Defendant provided the investigator with the password to unlock Defendant's phone. *Id.* at 21:10–23:11. The discussion lasted for approximately 32 minutes,[3] and during that time Defendant did not request an attorney or invoke his right to remain silent (other than by saying "I can't" at the beginning of the interview, as recounted above).[4] The interview concluded with the investigator returning to his desk, telling Defendant to let him know if there was anything else Defendant wanted to tell him. *Id.* at 32:20–32:29.

## II.   Analysis

Defendant moves to suppress the items recovered from the warrantless search of the car. (Doc. 317). He maintains that the GSP troopers unlawfully prolonged the traffic stop beyond its legitimate mission (to write Ms. Young a

---

[3]     The investigator testified that the interview lasted "about an hour," (Doc. 868 at 109), but the video shows that it was approximately 32 minutes, (Gov. Exh. 11).

[4]     To be clear, none of the parties identify a time when Defendant requested an attorney or expressly invoked his right to remain silent (other than by him saying "I can't" at the beginning of the interview), nor have I located such a request or invocation. That being said, Defendant speaks softly during the discussion, and there are times that I could not entirely understand what he was saying. But I heard nothing on the recording that even remotely sounded like a request for a lawyer, and Defendant never took any action to terminate the interview.

warning for the license plate violation) by engaging in questioning unrelated to the stop. (Doc. 907 at 7–12). The Government, in turn, argues that the troopers had probable cause to search the vehicle before the traffic stop even occurred based on the DEA's investigation that occurred over the course of the proceeding weeks. (Doc. 920 at 10–15). In making this argument, the Government relies on a combination of the collective-knowledge doctrine (whereby the collective knowledge regarding the investigation can be imputed to the troopers) and the automobile exception to the warrant requirement. *Id.* The Government further maintains that the troopers' observations during the traffic stop gave them "further basis" to believe that there were drugs in the car. *Id.* at 14. As to the statements, Defendant argues that he invoked his right to remain silent when he told Agent Gray at the scene of the stop that he did not want to talk any more unless the agents let Ms. Young go, when he told Investigator Santa at the precinct that he "can't" talk to him, and when he largely remained silent during the course of the interview. (Doc. 907 at 12–14). The Government maintains that Defendant was properly informed of his rights, that he agreed to speak with the officers, and that he never invoked his right to remain silent. (Doc. 920 at 15–17). Defendant did not file a reply brief, and the issues are now ripe for resolution.

11

### A. Probable Cause Prior to the Stop

The Government argues that the trooper had probable cause to search the car for drugs even prior to the stop based on what the agents learned through the course of their investigation. Its argument relies on a combination of the automobile exception to the warrant requirement and the collective-knowledge doctrine.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "To guarantee this right, the Fourth Amendment generally requires law enforcement officers to obtain a warrant before conducting a search." *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019). There are exceptions to the warrant requirement, however, including one for automobiles. "Under the automobile exception to the warrant requirement, the police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *Id.* (internal quotation marks omitted). "For a warrantless search of an automobile to be constitutional, (1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime." *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011). "Probable cause exists when there is a fair

12

probability that contraband or evidence will be found in the vehicle under the totality of the circumstances." *Id.* at 1300. "Probable cause deals with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 241 (1983) (internal quotation marks omitted).

Here the automobile was readily mobile, as agents observed Defendant drive it away from the house and Trooper Youngblood followed behind the moving car before he initiated the traffic stop. *See, e.g., United States v. Santana*, No. 1:17-CR-408-AT-RGV, 2018 WL 7283633, at *10 (N.D. Ga. Sept. 19, 2018) (finding that a car was readily mobile where the trooper followed the vehicle, pulled it over, and it stopped with no indication that it had ceased to be operational), *adopted by* 2019 WL 365743 (N.D. Ga. Jan. 30, 2019).

The second requirement for the automobile exception is that Trooper Youngblood had to have probable cause to believe that the vehicle contained contraband or evidence of a crime. As an initial matter, the Court agrees with the Government that it may consider the collective knowledge of the agents when determining whether the trooper had probable cause to stop and search Defendant's car even before he observed the obscured-license-plate violation. As the Eleventh Circuit has held, probable cause "exists where the facts and

13

circumstances *within the collective knowledge of law enforcement officials*, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (internal quotation marks omitted and emphasis added). The collective-knowledge doctrine applies, however, only if the law enforcement officers "maintained at least a minimal level of communication during their investigation." *Id.* "Thus, where, like here, the Government proceeds on a 'collective knowledge' theory, the validity of the stop and subsequent search rises and falls on the level of communication between the officer who conducted the stop and the other law enforcement officers who were aware of the facts establishing probable cause." *United States v. Kahn*, No. 1:17-CR-40-SCJ, 2018 WL 2214813, at *6 (N.D. Ga. May 15, 2018).

Here the level of communication between the agents and troopers was sufficient for the Court to impute to Trooper Youngblood the collective knowledge of the group. DEA agents had previously arranged to have the GSP and APD assist with the traffic stop. (Doc. 868 at 13). Agents were in contact with GSP throughout the surveillance of the Camry—Agent Tice testified that "GSP would have known that the vehicle left. We would have given a description of the vehicle and the tag number of that vehicle, and its current location kind of…a play by play as we were

14

conducting surveillance." *Id.* at 16. And Trooper Youngblood testified that he was in "fairly constant contact" with DEA during the event and was informed that the car was a gray or silver Toyota Camry. *Id.* at 33, 54. Indeed, agents and state law enforcement officers maintained uninterrupted surveillance of the Camry from the time it left the house until it was stopped by Trooper Youngblood. *Id.* at 16. This level of communication is consistent with that of cases where other judges on this court have permitted the Government to rely on the collective-knowledge doctrine. *See, e.g., United States v. Guzman*, No. 1:17-CR-405-TWT-LTW-2, 2018 WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018) (finding sufficient communication where the DEA coordinated with Georgia State Patrol prior to the operation, communicated with GSP during the operation, and directed GSP to stop the vehicle), *adopted by* 2019 WL 718371 (N.D. Ga. Feb. 20, 2019); *Khan*, 2018 WL 2214813, at *7 (finding sufficient minimal communications where DEA contacted the trooper prior to the stop, the trooper was on stand-by on the date in question, the trooper had a DEA radio in his car, the DEA was communicating with the trooper by radio on the day of the stop, and the trooper knew what was happening via updates over the DEA radio); *United States v. Agarwal*, No. 1:17-CR-43-TCB-RGV, 2018 WL 3061923, at *10 (N.D. Ga. Apr. 6, 2018) (finding sufficient communications where the DEA contacted Georgia State Patrol for assistance, the

15

trooper attended the DEA briefing on the morning of the scheduled buy, and the trooper was in communication with the DEA by phone or radio throughout the day to learn the description and movement of the vehicle as well as the timing and location of the transaction), *adopted by* 2018 WL 2181620 (N.D. Ga. May 11, 2018).

And based on the collective knowledge of the law enforcement agents, Trooper Youngblood had probable cause to stop and search the car in which Defendant was traveling, regardless of any traffic violations. As noted above, DEA agents had identified the house as a stash house used to support narcotics distribution. (Doc. 868 at 7–8). Indeed, several weeks prior to the traffic stop in this case, agents had intercepted communications indicating that a customer was going to pick up drugs at the house on November 14, 2018. *Id.* at 8. On that day, agents observed a vehicle arrive at the house, stay for about 35 minutes, and leave. *Id.* at 9. GSP troopers subsequently stopped that car and recovered approximately four kilograms of methamphetamine. *Id.* at 10.

Several weeks later, agents again intercepted communications suggesting that there was going to be another drug transaction at the house. Specifically, they intercepted wiretap communications between Valencia (who they now suspect to be defendant Salvador Valencia-Zavala) and an unknown male (who they now believe is Defendant Edwards). *Id.* at 11. In those conversations, Valencia told the

16

male that the male needed to bring $6,000 to pay off a debt and $32,000 for what he was picking up, and that the male would receive a total of eight kilograms of drugs. *Id.* at 11–12. Valencia sent a text message to the male with the address of the house. *Id.* at 12.

On November 29, 2018, DEA agents observed a gray Toyota Camry turn onto Old White Mill Road, and approximately 20 seconds later the car appeared on the pole camera footage at the house. *Id.* at 13. Because it was dark, agents were not able to see who was in the car or identify who went into the house. *Id.* at 14. However, the same unknown male who was previously intercepted sent a text message to Valencia saying "I'm here." *Id.* at 14–15. Agents then intercepted calls between Juan Chavez and Emmanuel de Santos Nieto (both defendants in this case) where Chavez told Santos Nieto to count the money "and make sure that the 38 was there." *Id.* at 15, 24. Shortly thereafter, Santos Nieto told Chavez that "the one for 8 pantalonas had left." *Id.* at 15. DEA Special Agent Tice testified that agents involved with this investigation identified "pantalonas" as a code word for one kilogram of methamphetamine. *Id.* Approximately 20 minutes after it arrived at the house, the gray Camry left the house. *Id.* at 14.

All told, the evidence establishes probable cause for the agents to have stopped the gray Camry that departed the house on November 29. To recap, the

17

agents had previously identified the house as a stash house and had successfully intercepted four kilograms of cocaine. The events of November 14 support the probable-cause finding. On that day, agents intercepted communications indicating that a drug transaction would occur at the house, they watched a car arrive at the house and stay for a short period of time, and they stopped that car and recovered a large quantity of drugs. That same scenario played out again on November 29. Agents intercepted communications suggesting that someone was going to bring $38,000 to the house and receive eight kilograms of drugs. Valencia sent the person a text with the address of the house, and the person subsequently sent a text to Valencia saying "I'm here" at the same time as the agents saw a gray Camry arrive. Chavez then called Santos Nieto and told him to count the money and to make sure "that the 38 was there." This call is entirely consistent with the prior intercepted communication, which suggested that the customer would be bringing $38,000 to the transaction. And to top it off, Santos Nieto later let Chavez know that "the one for 8 pantalonas had left"—which is again consistent with the prior intercepted communications suggesting that the customer would receive eight kilograms of drugs. As with the transaction on November 14, the gray Camry stayed at the house for a relatively short period of time and then left. And agents

18

maintained constant surveillance on the car until Trooper Youngblood initiated the stop.

The totality of these facts gave agents ample probable cause to believe that the person arranging the transaction involving $38,000 and eight kilograms of drugs was inside the gray Camry they were surveilling and that the drugs would be located inside that vehicle. *See, e.g., United States v. Olvera*, 178 F. App'x 373, 374–75 (5th Cir. 2006) (affirming the district court's finding of probable cause to believe that the defendant was transporting cocaine based on interceptions of recorded phone calls and observation of defendant on the day of the suspected drug delivery); *United States v. Edenilson-Reyes*, No. 1:09-CR-361-RWS-AJB, 2010 WL 5620439, at *7–8 (N.D. Ga. Oct. 26, 2010) (finding probable cause based on conversations intercepted over the defendant's phone and subsequent observation of suspicious events that were consistent with the phone calls), *adopted by* 2011 WL 195679 (N.D. Ga. Jan. 20, 2011); *United States v. Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1339–40 (N.D. Ga. 2009) (finding probable cause based on intercepted phone calls, a prior search and seizure, and observations corroborating the details the agents learned from the calls); *United States v. Pineda*, No. 1:06-CR-350-WSD, 2008 WL 686239, at *10–11 (N.D. Ga. Mar. 10, 2008) (finding probable cause based on

19

intercepted phone calls suggesting that a drug transaction was going to take place and surveillance consistent with those calls).[5]

**B.    Whether the Trooper Unconstitutionally Prolonged the Traffic Stop**

Because Trooper Youngblood had probable cause to stop the car in which Defendant was traveling and search it for evidence of the drug transaction discussed over the intercepted communications, the undersigned declines to address Defendant's argument that the trooper unconstitutionally prolonged the stop by engaging in an investigation unrelated to the traffic violation. (Doc. 907 at 7–12).

**C.    Whether Defendant Invoked His Right to Remain Silent**

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel." *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010). The entitlement to *Miranda* warnings, however, "attaches only when custodial interrogation begins." *Id.* (internal quotation marks omitted). Interrogation, for purposes of *Miranda*, includes "express questioning" as well as

---

[5] Defendant offers nothing in response to the Government's argument that the trooper had probable cause to stop the car independent of the license-plate violation. Defendant did not address this issue—which the Government made in the response brief—in his opening brief, and although Defendant had the opportunity to file a reply, he did not do so.

"any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980) (footnote omitted). "Because the underlying purpose of the *Miranda* rule is to dispel compulsion, the relevant inquiry in deciding whether words or actions constitute interrogation focuses primarily upon the perceptions of the suspect, rather than the intent of the police." *United States v. Hicks*, 546 F. Supp. 2d 1378, 1381 (N.D. Ga. 2008) (internal quotation marks omitted). "The government bears the burden of showing that the defendant's in-custody statements were obtained in compliance with the dictates of *Miranda* and were otherwise voluntary, or whether some exception to the *Miranda* rule applies." *United States v. Chaidez-Reyes*, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014) (internal quotation marks, citations, and footnote omitted).

The parties do not dispute that Defendant was in custody following the canine alert—when he was handcuffed and placed in the back of the APD patrol car—or that he was subject to interrogation. Nor does Defendant contend that he was not read his *Miranda* warnings or that the warnings were somehow deficient. Rather, Defendant argues that he invoked his right to remain silent on a number of occasions. (Doc. 907 at 12–14).

21

"When a person undergoing a custodial interrogation states that he wishes to remain silent the questioning must end.…" *United States v. Ochoa*, 941 F.3d 1074, 1098 (11th Cir. 2019) (internal quotation marks omitted). However, a suspect invoking his right to remain silent must do so unambiguously; "an ambiguous or equivocal act, omission, or statement" will not suffice. *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010); *see also Owen v. Fla. Dep't of Corr.*, 686 F.3d 1181, 1192 (11th Cir. 2012) (holding that "a defendant who wishes to invoke his right to remain silent must do so unambiguously and unequivocally" (internal quotation marks and alteration omitted)). "An unequivocal and unambiguous invocation of the right to remain silent is one articulated sufficiently clearly that a reasonable police officer in the circumstances would understand the statement *to be* a request to exercise his right to remain silent and terminate the interrogation, not that it *might be* a request to remain silent." *Owen*, 686 F.3d at 1194 (internal quotation marks omitted, emphasis in original).

There are several relevant events, and the Court takes them up chronologically. First, investigator Santa read Defendant his *Miranda* warnings, Defendant said that he understood his rights, and Defendant told Santa "I'll talk to you." (Doc. 868 at 96–97; Gov. Exh. 12). So far, so good for the Government.

Second, while still on the scene of the arrest, and after Santa had advised Defendant of his rights, DEA Special Agent Gray asked Defendant if he would

22

talk, and Defendant said (and the agent was paraphrasing) that he "didn't want to talk to me any more if we weren't going to let the girl go." (Doc. 868 at 124). Defendant, without much analysis or citation of authority, says that this was a clear invocation of Defendant's right to remain silent. (Doc. 907 at 13). The Government says that this statement was "certainly not ambiguous." (Doc. 920 at 17) (the Government probably means to say that the statement was certainly not unambiguous). The Government does not offer much in the way of explanation, and I have trouble seeing why this was not an unambiguous invocation. The first part of the statement, that Defendant "did not want to talk anymore," is clear enough. Which leaves the condition precedent—that Defendant did not want to talk anymore if the agents were not going let "the girl" go (a clear reference to Ms. Young).

Neither party cites any cases dealing with an otherwise clear invocation predicated on a condition precedent—where a defendant says, "I will talk, but only if" a particular event or condition occurs first. I have not located much in the way of case law, but the little I have found supports the notion that an otherwise clear invocation does not become ambiguous or equivocal simply because there is a condition precedent attached. In *United States v. Degaule*, the defendant initially told the agents that they had to complete a questionnaire that he provided them before he could answer any questions. 797 F. Supp. 2d 1332, 1380, n.52 (N.D. Ga.

23

2011). The court found that the defendant's invocation was ambiguous, however, because the defendant nevertheless agreed to answer questions (after being advised of his *Miranda* rights) *while* the agent completed the questionnaire—in other words, the defendant did not ultimately "insist that the questionnaire be completed as a condition precedent to waiving his rights since he agreed that [the agent] could complete the questionnaire while they were going through the process, and [the defendant] initialed and signed the waiver form and proceeded with the interview without the questionnaire having been completed." *Id.* at 1380 n.52. Here, in contrast, Defendant did not back off of his "condition precedent" when he was speaking with Agent Gray—upon hearing Defendant's condition that "you guys need to just let her go, or I don't talk to you any more" the agent simply said "okay and walked away." (Doc. 868 at 126).

This case is not unlike *United States v. Shoulderblade*, No. CR 17-135-BLG-DLC, 2018 WL 468277 (D. Mont. Jan. 18, 2018). There, agents were questioning the defendant and, in the course of the discussion, they referenced a video camera near the scene of the crime. *Id.* at *1. The agents suggested to the defendant that they suspected he was being less than truthful and wanted to "start over." *Id.* at *2. The defendant said, "No, I don't want to answer any further questions until I see [the] video." *Id.* The agents told him that they did not have the video, and the questioning continued. *Id.*

24

The defendant argued that the statements that he made after telling the agents that he did not want to answer any questions until he saw the video should be suppressed. *Id.* at *3. The court agreed and rejected the government's argument that the condition itself made the invocation ambiguous. *Id.* at *5 ("The fact that an invocation is conditional does not mean that the invocation is ambiguous."). The court further noted that it did not matter that the agents could not satisfy the condition because they did not have the video—"[t]he fact that the Agents 'could not and would not' satisfy Shoulderblade's condition does not render it ambiguous, it meant that Shoulderblade had invoked his right to remain silent." *Id.* at *6.

Here, Defendant unambiguously invoked his right to remain silent. He told Agent Gray that he did not want to talk anymore unless the agents let Ms. Young go. The first part of that statement, that he did not want to talk anymore, is clear. And the condition that follows make it no less so. Indeed, following Defendant's statement, Agent Gray ended the conversation and walked away. (Doc. 868 at 125); *see Owen*, 686 F.3d at 1194 (noting that "[a]n unequivocal and unambiguous invocation of the right to remain silent is one articulated sufficiently clearly that a reasonable police officer in the circumstances would understand the statement *to be* a request to exercise his right to remain silent" (internal quotation marks omitted, emphasis in original)).

25

As the Government recognizes, chronologically there is still no Constitutional violation, because once Defendant invoked the right to remain silent, the agent ended the conversation and walked away. (Doc. 920 at 16). The problem is that Investigator Santa later questioned Defendant at the APD precinct after transporting him from the scene of the arrest. And because Defendant had validly invoked his right to remain silent with Agent Gray, all questioning had to cease. *Ochoa*, 941 F.3d at 1098 ("When a person undergoing a custodial interrogation states that he wishes to remain silent the questioning must end…."). Therefore, the statements Defendant made at the precinct to Santa, after Defendant had invoked his right to remain silent at the scene, should be suppressed.

The Government argues that "even if Edwards invoked his right to silence when he was talking to Agent Gray—and the government submits that he did not—that invocation would not stand when Officer Santa interviewed him later that evening." (Doc. 920 at 16–17). It is not entirely clear to the undersigned, however, why that would be the case. The Government cites to *United States v. Grimes* for the proposition that "the defendant must assert the right to remain silent when he is being interrogated, not some earlier time." (Doc. 920 at 16). In *Grimes*, the Eleventh Circuit held that a defendant may not "anticipatorily" invoke the right to remain silent, explaining that "*Miranda* rights may be invoked only during custodial interrogation or when interrogation is imminent." 142 F.3d 1342,

26

1348 (11th Cir. 1998). But here, Defendant did invoke his right to remain silent with Agent Gray during the course of his conversation with the agent—in other words, during the custodial interrogation. (Doc. 868 at 124–25).

Neither party really addresses this key question: after Defendant invoked his right to remain silent with Agent Gray, did Investigator Santa violate Defendant's rights when he later questioned him at the APD precinct? In *Michigan v. Mosley*, the defendant was advised of his rights and invoked his right to remain silent with a particular officer, who immediately ceased the interrogation. 423 U.S. 96, 104 (1975). More than two hours later, a different officer—after reading the defendant a fresh set of *Miranda* warnings—questioned defendant (in a different location) about a different crime. *Id.* at 104–05. The Supreme Court held that the defendant's rights were not violated, noting that the police immediately ceased the initial interrogation, "resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." *Id.* at 106.

From *Mosley*, the Eleventh Circuit has distilled four factors that a court should consider when deciding whether questioning may be resumed following a suspect's invocation of the right to remain silent: "1) whether 'the initial interrogation ended immediately' upon invocation of the right to remain silent; 2)

27

whether 'a substantial amount of time elapsed' before questioning resumed; 3) whether the suspect 'was again read his rights' before the second round of questioning; and 4) whether the second round of questioning was done 'by a different officer about an unrelated crime.'" *United States v. Gray*, 771 F. App'x 976, 979 (11th Cir. 2019), *quoting Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1296–97 (11th Cir. 2007). The Court must consider the circumstances as a whole; the absence of a single factor is not dispositive. *Gray*, 771 F. App'x at 979.

Here the first factor weighs in favor of the Government—Agent Gray immediately ceased the questioning when Defendant invoked his right to remain silent. And the second does as well. Although it is not entirely clear how much time elapsed between Defendant's invocation on the side of the highway and the later questioning at the precinct, the circuit has held that questioning "over an hour later" weighed in favor of finding that the statements were admissible. *See United States v. Nash*, 910 F.2d 749, 752 (11th Cir. 1990); *see also Mosley*, 423 U.S. at 105–06 (concluding that an interval of more than two hours was a "significant period of time"). Even if the agents left the scene immediately after Defendant invoked his right to remain silent (and there is nothing to suggest that they did), the ensuing drive to the police station took some time, and the conversation at the station begins with Investigator Santa leaving his desk and walking to another room where Defendant was sitting on a bench—which suggests that the discussion

28

did not start immediately upon Defendant's arrival at the precinct. It is hard to imagine those events taking less than an hour. This factor weighs in the Government's favor—although not heavily, given the uncertainty about exactly how much time elapsed.

The remaining factors weigh in Defendant's favor. Investigator Santa did not readminister *Miranda* warnings. Indeed, if anything, he made the situation more confusing by mentioning *Miranda* and then incorrectly advising Defendant of his rights. Santa said, "I've already explained to you, you've been Mirandized, you know, you're free to talk to me." (Gov. Exh. 11 at 01:20–01:25). The point of *Miranda* is not that the suspect *is* free to talk to the officer, but rather that the defendant has the right *not* to do so. And the topic of discussion remained the same—Defendant's involvement in drug trafficking.

All told, given the totality of the circumstances, I recommend that Defendant's statements to Investigator Santa be suppressed. The investigator did not readvise Defendant of his *Miranda* warnings and, somewhat confusingly, mentioned *Miranda* while emphasizing that Defendant *was* free to talk. And he questioned Defendant about the same crime that was the subject of the earlier interrogation during which Defendant invoked the right to remain silent. Moreover, although the amount of time between interrogations weighs in the Government's favor, the weight I give to that factor is lessened because it is not

entirely clear how long the interval was (although it was at least enough time to drive from the scene of the stop to the APD precinct).

But even if the prior invocation of the right to remain silent (the one with Agent Gray) was insufficient, Defendant invoked again with Investigator Santa. The investigator asked Defendant if he wanted to talk, and Defendant said, "I can't." (Gov. Exh. 11 at 00:30–00:38). Santa said, "you cannot?" and Defendant again repeated, "I can't. I can't." *Id.* Defendant's answer to the question "what's going on, do you want to talk to me?" was succinct and clear—"I can't." There was no ambiguity in Defendant's assertion that he would not talk, and the interrogation should have ceased. *See, e.g., United States v. Mahon*, No. CR 09-712-PHX-DGC, 2010 WL 3954506, at *3 (D. Ariz. Sept. 29, 2010) (finding that a defendant's statement "The small talk is over. I can't say anything more—except for who is praying for the damn humidity to quit?" was sufficient to invoke his right to remain silent); *United States v. Landers*, No. 00-40093-01-RDR, 2001 WL 83278, at *2 (D. Kan. Jan. 10, 2001) (finding statement that "I can't talk to you then, thank you" was not ambiguous); *but see United States v. Sanchez*, 866 F. Supp. 1542, 1559 (D. Kan. 1994) (finding statement "I can't say nothing" was ambiguous where the trooper testified that he interpreted the statement to mean that the defendant

could not say anything out of fear of reprisal, and not as an invocation of the right to remain silent).[6]

For either of the reasons noted above—that Defendant invoked his right to remain silent with Agent Gray and therefore should not have been questioned anew by Investigator Santa, and that Defendant again invoked his right to remain silent with Investigator Santa—Defendant's motion to suppress statements that he made to Santa should be granted.

---

[6] Defendant also argues that he invoked his right to remain silent by remaining silent in response to many of the investigator's questions. (Doc. 907 at 13–14). The Supreme Court rejected a similar argument in *Berghuis*, and Defendant's contention fares no better here. 560 U.S. at 380–81 (rejecting an argument that a defendant invoked his right to remain silent "by not saying anything for a sufficient period of time").

## III.   Conclusion

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant's motion to suppress evidence, (Doc. 317), be **DENIED** and that Defendant's motion to suppress statements he made to Investigator Santa, (Doc. 318), be **GRANTED**. There are no other pretrial motions related to Defendant Joseph Edwards pending before the undersigned, and his case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED,** this 7th day of May, 2021.

_____
CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

32