IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | CRIMINAL ACTION NO. |
| | : | 1:19-cr-00076-LMM-CCB-13 |
| v. | : | |
| | : | |
| | : | |
| JOSEPH DOMINIC EDWARDS | : | |
| | : | |
| | : | |
| | : | |
| | : | |

## ORDER

This case comes before the Court on the Magistrate Judge's Report and Recommendation [997] that Defendant Joseph Dominic Edwards's Motion to Suppress Evidence [317] be denied and Motion to Suppress Statements [318] be granted. After due consideration, the Court enters the following Order:

## I.    BACKGROUND[1]

A Second Superseding Indictment charges Defendant with several offenses: conspiring to possess heroin, fentanyl, and methamphetamine with intent to distribute; possessing methamphetamine with intent to distribute;

---

[1] Unless otherwise indicated, the facts described below are taken from the transcript of an evidentiary hearing conducted before the Magistrate Judge on February 10, 2020 and September 8, 2020. See Dkt. No. [868]. Most of these facts are undisputed unless otherwise noted.

possessing a firearm in furtherance of a drug trafficking crime; and possessing a firearm despite a prior felony conviction. See Dkt. No. [393]. These charges stem from an investigation that led to Defendant's arrest on November 29, 2018.

During that investigation, the Drug Enforcement Administration ("DEA"), using wiretaps, surveillance, and other investigative tools, identified a suspected stash house on Old White Mill Road in Fairburn, Georgia. Intercepted communications indicated a drug transaction would occur at the house on November 14, 2018, and DEA agents established surveillance on the house. On November 14, agents observed a vehicle arrive at the house and depart 35 minutes later. The agents surveilling the house informed Georgia State Patrol ("GSP") officers when the vehicle left, and the GSP conducted a traffic stop of the vehicle. Inside were four kilograms of methamphetamine.

On November 29, the DEA and GSP repeated that procedure. The DEA had intercepted text communications between Defendant and men believed to be Salvador Valencia-Zavala and Juan Ramirez, both of whom are also defendants in this case. Agents thought that Defendant was coordinating a transaction for eight kilograms of methamphetamine: $32,000 for five kilograms, and three kilograms on credit. Agents believed Defendant would bring an additional $6,000 to the transaction to settle a debt. As they set up the deal, Mr. Valencia-Zavala sent Defendant the address of the Old White Mill Road house.

DEA agents informed the GSP and the Atlanta Police Department ("APD") that they anticipated a drug transaction would occur at the house on November

29. At approximately 6:26 PM on November 29, DEA agents observed a gray Toyota Camry approach the house. Agents intercepted a communication from Defendant informing Mr. Valencia-Zavala that he had arrived, and then a communication between men believed to be Juan Chavez and Emmanuel de Santos Nieto—also defendants in this case—in which one told the other to "make sure that the 38 was there." The Camry left the house 20 minutes after it arrived, and agents intercepted a phone call in which Benjamin Villareal Perez—anther co-defendant— allegedly told Mr. Chavez that "the one for 8 pantalonas had left." Agents understood "pantalona" to refer to a kilogram of methamphetamine.

DEA agents told the GSP that the Camry had left the Old White Mill Road house, and provided a description of the vehicle and its license plate number. Agents maintained surveillance of the vehicle and kept the GSP apprised of its location. GSP Corporal Richard Youngblood, who had been in "fairly constant contact" with the DEA and was monitoring the Camry in his patrol car, contends that he observed that the vehicle's license plate was partially obscured and initiated a traffic stop. He was accompanied by GSP Trooper Doug Allen and Trooper Allen's K-9 dog, Nico.

Approaching the vehicle from the passenger side, Corporal Youngblood observed a woman named Linda Young in the driver's seat, and Defendant in the passenger's seat. Corporal Youngblood asked Ms. Young to exit the vehicle so he could explain the ostensible reason for the stop. As he did so, Corporal Youngblood retrieved a warning notepad from his vehicle and asked Ms. Young

about her itinerary. Ms. Young stated she was on her way to South Carolina from her sister's house in Georgia and was traveling with her boyfriend. Corporal Youngblood continued to speak with Ms. Young as he completed the warning form, and when she stated she did not know the year of the vehicle, Corporal Youngblood approached Defendant to ask about the vehicle's registration.

Corporal Youngblood observed Defendant avoiding eye contact and looking in various directions, and on that basis believed Defendant was nervous. Defendant told Corporal Youngblood he and Ms. Young were traveling from Alabama—a statement inconsistent with what Ms. Young had just said. After obtaining the relevant information from Defendant, Corporal Youngblood returned to Ms. Young to complete the warning. When asked why she and Defendant gave discordant explanations of their itineraries, Ms. Young replied that she did not know. After completing the warning and running Ms. Young's information, Corporal Youngblood asked for consent to search the vehicle. Ms. Young refused, stating the vehicle was not hers.

Corporal Youngblood then asked Defendant to step out of the vehicle and frisked him. After doing so, Corporal Youngblood informed Defendant and Ms. Young that he and Trooper Allen would walk the K-9 around the car. The dog indicated the presence of drugs. Upon searching the vehicle officers located three- and five-kilogram bags of methamphetamine, and Defendant and Ms. Young were placed in handcuffs. By that point, APD Officer Jorge Santa had

arrived at the scene, and after being handcuffed Defendant was seated in the back of Officer Santa's squad car.

Officer Santa read Defendant a set of <u>Miranda</u> warnings. Officer Santa asked Defendant if he understood his rights and wished to speak with police without an attorney present. Defendant answered affirmatively. Officer Santa informed DEA Special Agent Patrick Gray, who had also arrived on the scene, that Defendant had been advised of his <u>Miranda</u> rights. Special Agent Gray spoke with Defendant for several minutes. Though the content of their conversation is unclear, at some point Defendant told Special Agent Gray that he did not want to talk with Special Agent Gray any longer if officers would not let Ms. Young go. Upon hearing that statement, Special Agent Gray ceased his questioning and walked away.

After officers cleared the scene, Defendant and Ms. Young were transported to an APD precinct and handcuffed to a bench. Sitting in an adjacent room, Officer Santa heard Defendant grinding his teeth. Officer Santa approached to ask why Defendant was stressed and whether he would like to talk. Dkt. No. [1000-2] at 0:20. Defendant replied, "I can't." <u>Id.</u> at 0:30. Officer Santa responded, "You cannot?" and Defendant again said, "I can't, I can't." <u>Id.</u> at 0:30–38. Officer Santa continued to pose questions to Defendant and Ms. Young for three minutes, at times receiving no response and at times receiving only a response from Ms. Young. Finally, Officer Santa told Defendant "You need to take a deep breath and talk to me." <u>Id.</u> at 3:26. Defendant did not immediately

respond, but eventually provided Officer Santa his phone's passcode and gave brief answers to some of Officer Santa's questions.

Defendant now moves to suppress the evidence obtained during the traffic stop and his statements to Officer Santa. After a two-part evidentiary hearing and post-hearing briefing, the Magistrate Judge recommended Defendant's Motion to Suppress Evidence be denied and Motion to Suppress Statements be granted. Defendant and the Government have each filed objections to the Magistrate Judge's Report and Recommendation. After reviewing the relevant legal standard, the Court each addresses motion to suppress in turn.

## II. LEGAL STANDARD

Under 28 U.S.C. § 636(b)(1), the Court reviews the Magistrate Judge's Report and Recommendation for clear error if no objections are filed. 28 U.S.C. § 636(b)(1). If a party files objections, the district court must review *de novo* any part of the Magistrate Judge's disposition that is the subject of a proper objection. Id. As Defendant and the Government have filed objections to the Magistrate Judge's findings, the Court reviews the challenged findings and recommendations on a *de novo* basis.

## III. DISCUSSION

### A. Motion to Suppress Evidence

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. "A traffic stop for a suspected violation of law is a 'seizure' of the occupants of the vehicle and therefore must be conducted in

accordance with the Fourth Amendment." <u>Heien v. North Carolina</u>, 574 U.S. 54, 60 (2014). A traffic stop is constitutional if officers have "probable cause to believe a traffic violation has occurred" or "'a reasonable, articulable suspicion based on objective facts that' an individual is engaged in criminal activity." <u>United States v. Harris</u>, 526 F.3d 1334, 1337 (11th Cir. 2008) (quoting <u>United States v. Powell</u>, 222 F.3d 913, 917 (11th Cir. 2000)). Probable cause and "[r]easonable suspicion [are] determined from the totality of the circumstances, and from the collective knowledge of all the officers involved in the stop," <u>United States v. White</u>, 593 F.3d 1199, 1203 (11th Cir. 2010) (citation omitted), provided the officers "maintained at least a minimal level of communication during their investigation," <u>United States v. Willis</u>, 759 F.2d 1486, 1494 (11th Cir. 1985). "The question is not whether a specific arresting officer actually and subjectively had the pertinent reasonable suspicion, but whether, given the circumstances, reasonable suspicion objectively existed to justify" the stop. <u>United States v. Nunez</u>, 455 F.3d 1223, 1226 (11th Cir. 2006) (citation and alterations omitted).

Once initiated, the "tolerable duration" of a traffic stop "is determined by [its] 'mission.'" <u>Rodriguez v. United States</u>, 575 U.S. 348, 354 (2015). "[A]n officer's investigation of a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" <u>United States v. Boyce</u>, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting <u>Terry v. Ohio</u>, 392 U.S. 1, 20 (1968)). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate that purpose,'" <u>Rodriguez</u>, 575 U.S. at

354, (alterations omitted) (quoting <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983) (plurality opinion)), "unless there is articulable suspicion of other illegal activity," <u>United States v. Purcell</u>, 236 F.3d 1274, 1277 (11th Cir. 2001).

In his post-hearing brief, Defendant argued Corporal Youngblood unconstitutionally prolonged the stop by asking questions unrelated to the traffic violation at issue and dilatorily completing required paperwork. Dkt. No. [907] at 10–11. In recommending the denial of Defendant's Motion to Suppress Evidence, the Magistrate Judge did not reach that argument. Instead, he held that, "regardless of any traffic violations," the information within the collective knowledge of law enforcement officers in communication with one another provided "probable cause to stop and search the car in which Defendant was traveling." Dkt. No. [997] at 16. Thus, the Magistrate Judge "decline[d] to address Defendant's argument that [Corporal Youngblood] unconstitutionally prolonged the stop by engaging in an investigation unrelated to the traffic violation." <u>Id.</u> at 20.

Defendant's objections are devoted almost entirely to re-raising that argument. Like the Magistrate Judge, however, the Court need not address it. When Corporal Youngblood initiated the traffic stop, information collectively known by law enforcement created an objectively reasonable suspicion that the Camry contained methamphetamine. That justified Corporal Youngblood's

conduct without regard to the justification for the stop he provided to Ms. Young.[2]

When Corporal Youngblood initiated the stop, several pieces of information known to law enforcement pointed to the presence of contraband in Defendant's vehicle. First, two weeks before the traffic stop, intercepted communications and surveillance led agents to recover several kilograms of methamphetamine from a vehicle that briefly stopped at the Old White Mill Road house. Then, agents intercepted messages between parties coordinating another drug deal at the house. When a vehicle approached the house on the given date, agents observed several communications consistent with the deal terms the parties had previously discussed. The vehicle remained at the house for roughly the same length of time as the vehicle that had been interdicted two weeks before, and after it left, suspects sent additional messages indicating a methamphetamine transaction had occurred. Taken together, these observations supply far more than the "minimal, objective justification" required "for an investigatory stop." Boyce, 351 F.3d at 1107 (citation omitted). Each intercepted communication and in-person observation before and on November 29 is consistent with the notion that the occupants of the Camry exchanged thousands of dollars for several kilograms of methamphetamine at the Old White Mill Road

---

[2] Although Defendant only briefly addresses the Magistrate Judge's findings on this point, Defendant challenges the Magistrate Judge's conclusion that his Motion to Suppress Evidence should be denied. Thus, the Court reviews the Magistrate Judge's conclusion and reasoning *de novo*.

house, and that the Camry contained the methamphetamine acquired in that transaction.

Defendant does not point to countervailing evidence. Instead, he argues that DEA agents did not adequately communicate this information to Corporal Youngblood, who was merely instructed by the DEA to stop the Camry. Dkt. No. [1007] at 1. Nor, Defendant says, was Corporal Youngblood "made aware of any prior arrests related to purchases of narcotics at" the house. Id. In other words, Defendant disputes not the existence of a reasonable suspicion of criminal activity, but officers' collective knowledge of the facts undergirding that suspicion.

That argument cannot withstand the testimony of Corporal Youngblood and other law enforcement personnel involved in Defendant's traffic stop. First, DEA agents maintained uninterrupted surveillance of the Camry after it left Old White Mill Road and relayed its license plate number to the GSP. Dkt. No. [868] at 16. Corporal Youngblood testified that DEA agents informed him prior to the stop that subjects of an investigation might be entering a certain area to purchase illegal drugs. Id. at 32. He therefore knew the DEA suspected the presence of contraband in the gray Camry before he initiated the stop. Id. at 55. He received identifying details about the Camry, id. at 33, and maintained "fairly constant contact with the DEA" throughout the stop, id. at 54. This plainly surpasses the "minimum level" of information exchange required to trigger the collective knowledge rule. Willis, 759 F.2d at 1494; see Nunez, 455 F.3d at 1226 (when one

officer told another he had probable cause to believe a house was used for marijuana cultivation, second officer's observation of conduct consistent with cultivation justified traffic stop of vehicle leaving the house); <u>United States v. Pineda</u>, No. 1:06-cr-350-WSD, 2008 WL 686239, at \*9–10 (N.D. Ga. Mar. 10, 2008) (sufficient communication when DEA agent described to police officer the vehicle to be stopped and the agent said he suspected the vehicle contained cocaine); <u>United States v. Kapperman</u>, 764 F.2d 786, 789–91 & n.5 (11th Cir. 1985) (probable cause existed in part because of identifying information communicated by separate law enforcement agency); <u>Whiteley v. Warden, Wyo. State Penitentiary</u>, 401 U.S. 560, 568 (1971) (officer properly relied on police radio bulletin describing suspects). Because information within the collective knowledge of law enforcement officers provided objective and particularized reasons to suspect the Camry's occupants had just acquired illegal drugs and that the Camry contained those drugs, Corporal Youngblood's traffic stop was constitutional.

Nonetheless, Corporal Youngblood waited until he observed a traffic violation to initiate the stop—in his words, "to make sure I have the bas[e]s covered" and to "have my own probable cause." Dkt. No. [868] at 38. Defendant argues that the traffic violation—a partially obscured license plate—"was [Corporal Youngblood's] legal justification" for the stop. Dkt. No. [1007] at 2. Thus, Defendant says, Corporal Youngblood "needed to detain the occupants [of

the vehicle] only for as long as necessary to write a citation or warning for the violation." Id.

But whatever Corporal Youngblood's subjective motivation for initiating the stop,[3] "an officer's motive in making [a] traffic stop does not invalidate what is otherwise 'objectively justifiable behavior under the Fourth Amendment.'" United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (quoting Whren v. United States, 517 U.S. 806, 812 (1996)). Defendant's focus on the traffic violation ignores that the evidence of methamphetamine in the Camry created a second and independent basis for the stop. This is not a case where a traffic violation supplied the sole basis for a traffic stop, and an officer prolongs the stop to investigate wrongdoing unrelated to the traffic violation. See Rodriguez, 575 U.S. at 354–55. In that situation, "the seizure's 'mission' [is] to address the traffic violation that warranted the stop." Id. at 354 (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)). Here, regardless what Corporal Youngblood "professed" to Defendant and Ms. Young, Dkt. No. [1007] at 9, there were objective justifications both for issuing a traffic citation and investigating the presence of contraband in the vehicle. Thus, the stop had two objectively reasonable

---

[3] The record does not actually indicate that Corporal Youngblood stopped the Camry solely because its license plate was partially obscured. Corporal Youngblood testified that at the time of the stop he had reasonable suspicion that the vehicle contained contraband. Dkt. No. [868] at 37–38.

missions.[4] In these circumstances, the traffic stop was "lawful at its inception and otherwise executed in a reasonable manner." Caballes, 543 U.S. at 408. The K-9 sniff of the exterior of Defendant's vehicle therefore does not "implicat[e] Fourth Amendment concerns." United States v. Tamari, 454 F.3d 1259, 1265 n.6 (11th Cir. 2006) (citing Caballes, 543 U.S. at 410).

When the GSP's K-9 indicated the presence of drugs, officers acquired probable cause to search the vehicle under the well-established "automobile exception" to the warrant requirement. See United States v. Place, 462 U.S. 696, 707 (1983) (holding that an alert from a well-trained drug-detection dog creates probable cause);[5] United States v. Ross, 456 U.S. 798, 806–07 (1982) (discussing the automobile exception).[6] The methamphetamine and other contraband that

---

[4] Even if Corporal Youngblood's expressed reason for stopping the Camry initially limited the scope of his investigation, the extension of a traffic stop "beyond completion of the traffic infraction investigation" is permissible when officers develop reasonable suspicion of other criminal activity. Rodriguez, 575 U.S. at 358; Purcell, 236 F.3d at 1277. As explained above, Corporal Youngblood had ample reason to suspect the vehicle contained methamphetamine. Defendant and Ms. Young's inconsistent answers to Corporal Youngblood's investigatory questions—which Corporal Youngblood asked as he was writing Ms. Young's warning—and Defendant's nervous demeanor reasonably heightened Corporal Youngblood's suspicion of illegal activity. Dkt. No. [868] at 42–44.

[5] Defendant does not contest that the K-9 was adequately trained, and there is no evidence indicating otherwise.

[6] In addition to probable cause, the automobile exception requires that the vehicle searched is "readily mobile." United States v. Lanzon, 639 F.3d 1293, 1300 (11th Cir. 2019). There is no dispute that the Camry, which Corporal Youngblood pulled over on a public road, was mobile.

officers recovered during their subsequent search was constitutionally obtained, and Defendant's Motion to Suppress that evidence is **DENIED**.

### B.   Motion to Suppress Statements

Next, Defendant moves to suppress the statements he made to Officer Santa during his interrogation at the APD precinct. The Magistrate Judge recommended the Court grant this Motion. Specifically, the Magistrate Judge found that: (i) During the traffic stop, Defendant unambiguously invoked his right to remain silent when he informed Special Agent Gray that he no longer wished to speak if agents "weren't going to let the girl go"; (ii) Officer Santa did not scrupulously honor that invocation when he later interrogated Defendant at the APD precinct; and (iii) Defendant again unambiguously asserted his right to silence during that second interrogation. Dkt. No. [997] at 25–30 (quoting Dkt. No. [868] at 124). The Government challenges the second and third findings, but not the first. Dkt. No. [1008] at 4 & n.2.

"[W]hen a person questioned in police custody indicates that 'he wishes to remain silent, the interrogation must cease.'" Owen v. Fla. Dep't of Corr., 686 F.3d 1181, 1192 (11th Cir. 2012) (quoting Miranda v. Arizona, 384 U.S. 436, 473–74 (1966)). "However, a defendant who wishes to invoke his right to remain silent must do so unambiguously and unequivocally." Id. (citations and quotation marks omitted). When a defendant properly invokes that Fifth Amendment right, the admissibility of his subsequent statements "depends under [Miranda] on

whether his right to cut off questioning was scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 104 (1975) (quotation marks omitted).

Although neither party objects, the Court must as a threshold matter review for clear error the Magistrate Judge's conclusion that Defendant unambiguously invoked his right to remain silent during the traffic stop. "The inquiry as to whether a suspect's invocation of his right to remain silent was ambiguous or equivocal is an objective one . . . . A suspect must articulate his desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." Medina v. Singletary, 59 F.3d 1095, 1101 (11th Cir. 1995) (citations omitted). Defendant's statement, as recalled by Special Agent Gray, that "he didn't want to talk to [Special Agent Gray] any longer unless [agents] let the girl go," Dkt. No. [868] at 125, does not admit of "multiple plausible, differing interpretations," United States v. Isaac, 448 F. App'x 954, 957 (11th Cir. 2011) (per curiam) (citing United States v. Acosta, 363 F.3d 1141, 1155 (11th Cir. 2004)). Those words make clear that, so long as officers did not comply with Defendant's request, Defendant would not speak. Officers did not fulfill Defendant's condition, Special Agent Gray ceased his questioning, and Defendant did not speak again. The Court finds no clear error in the Magistrate Judge's conclusion that Defendant's statement to Special Agent Gray constituted an unambiguous Miranda invocation.

Next is the question the Government primarily contests: whether Defendant's invocation was scrupulously honored. Under Mosley, the answer to that question turns on four factors: first, whether "the initial interrogation ended immediately once [Defendant] invoked his right to remain silent"; second, whether "a substantial amount of time elapsed" before Defendant's interrogation resumed; third, whether Defendant "was again read his rights" before the interrogation resumed; and fourth, whether "once the interrogation resumed, [Defendant] was questioned by a different officer about an unrelated crime." Gore v. Sec'y for Dep't of Corr., 492 F.3d 1273, 1297 (11th Cir. 2007). The Magistrate Judge found that the first two factors favor the Government, but that the latter two weigh more heavily in the opposite direction. The Government objects only to the Magistrate Judge's findings as to the third and fourth factors. Thus, the Court reviews the Magistrate Judge's analysis of the first and second factors for clear error, and of the third and fourth factors *de novo*.

To begin, testimony at the evidentiary hearing clearly indicates that when Defendant invoked his right to remain silent at the scene of the traffic stop, Special Agent Gray stopped his questioning. When asked what he did after Defendant said he would not talk unless Ms. Young was released, Special Agent Gray said he "walked away from [Defendant], ended our conversation." Dkt. No. [868] at 125. The record does not indicate that further questioning took place until Officer Santa approached Defendant at the APD precinct.

Nor did the Magistrate Judge clearly err in finding that, while a substantial amount of time elapsed between Defendant's first and second interrogations, this factor only weakly favors the Government. The passage of a substantial amount of time is a "minim[um] require[ment]" that serves a "prophylactic" function. Jacobs v. Singletary, 952 F.2d 1282, 1293 (11th Cir. 1992). During this period, "the police are barred from interrogating" a suspect unless the suspect initiates conversation. Christopher v. Florida, 824 F.2d 836, 844 (11th Cir. 1987). The length of this period is not fixed; it is determined by the "totality of the circumstances" of each case.[7] Singletary, 952 F.2d at 1294.

Here, the record does not make the circumstances preceding Defendant's second interrogation clear. Officer Santa testified that Defendant was transported to the precinct "as soon as [officers] cleared the scene of the traffic stop." Dkt. No. [868] at 109. That does not necessarily indicate a protracted period between Defendant's invocation and second interrogation, but it is not apparent how long it took to clear the scene or how far the precinct was from the scene of the stop.

---

[7] Citing United States v. Nash, 910 F.2d 749, 752 (11th Cir. 1990), the Magistrate Judge wrote that "the circuit has held that questioning 'over an hour later' weigh[s] in favor of finding" statements admissible. Dkt. No. [997] at 28. The Magistrate Judge concluded that, because the interval in this case appears not to be shorter than the interval in Nash, a substantial amount of time had passed between Defendant's first and second interrogations. Id. at 28–29. Such a straightforward comparison "hinge[s] [the] evaluation of scrupulous observance on only the passage of a discrete amount of time from [Defendant's] invocation of [his] right to remain silent until a given round of subsequent questioning." Singletary, 952 F.2d at 1294 (differentiating such a method from a totality-of-the-circumstances standard). Nonetheless, for the reasons explained below the Magistrate Judge's ultimate conclusion is not clearly erroneous.

Furthermore, there is no evidence of circumstances that might require a longer interval: Officers appear to have left Defendant alone after his invocation, and there was no testimony about any attempt to resume questioning before Officer Santa approached Defendant at the APD precinct. See Singletary, 952 F.2d at 1294 (several efforts to resume interrogation required interval longer than two hours); Nash, 910 F.2d at 752 ("over one hour" period sufficient in part because officers "left [the defendant] alone inside a police vehicle" after he asserted his right to remain silent). Given officers' compliance with Miranda during the traffic stop and the fact that some delay preceded Defendant's second interrogation, the Court cannot say the Magistrate Judge's conclusion was clearly erroneous. See Nash, 910 F.2d at 752 (declining to find clear error when district court plausibly interpreted ambiguous facts). And because the chronology of Defendant's second interrogation is unclear, the Magistrate Judge correctly placed little weight on this factor.

Next, the Magistrate Judge found that Officer Santa did not administer a fresh set of Miranda warnings before interrogating Defendant at the APD precinct. Although the Government challenges this finding, Officer Santa's body camera footage shows that he began questioning Defendant and Ms. Young without informing Defendant of his Miranda rights. After asking Defendant how he was doing, Officer Santa said, "Do you want to talk to me?" Dkt. No. [1000-2] at 0:30. Defendant replied, "I can't." Id. at 0:32. Officer Santa confirmed Defendant's response: "You cannot?" Defendant said again, "I can't, I can't." Id.

at 0:33–38. Officer Santa continued to question Defendant and Ms. Young about the house to which they had traveled and the destination to which they were headed. At no point did Officer Santa administer a <u>Miranda</u> warning. To the contrary, in an apparent effort to encourage Defendant to speak, Officer Santa told Defendant he was "free to talk" because he had already "been Mirandized." <u>Id.</u> at 1:20–25. In a stationhouse interrogation such as this, <u>Miranda</u> is meant to counteract the "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." <u>Miranda</u>, 384 U.S. at 467; <u>see also</u> <u>Illinois v. Perkins</u>, 496 U.S. 292, 296 (1990). As the Magistrate Judge noted, Officer Santa's statement conveyed the opposite message. <u>See</u> Dkt. No. [997] at 29. Officer Santa only compounded the confusion when, three minutes later, he told Defendant, "You need to take a deep breath and talk to me." Dkt. No. [1000-2] at 3:26.

The Government does not argue that Defendant received a new set of <u>Miranda</u> warnings before his second interrogation. Instead, it points to <u>United States v. Johnson</u>, No. 08–cr–94–bbc, 2008 WL 4186533 (W.D. Wis. Sept. 9, 2008), in which, the Government says, "the passage of time[] and the reference to the earlier advice of *Miranda* rights" rendered a defendant's statement admissible. Dkt. No. [1008] at 6. In <u>Johnson</u>, a defendant, sitting in a stationhouse interview room, invoked his right to remain silent before he was Mirandized. 2008 WL 4186533, at *1. An officer made a second attempt to interview him about 25 minutes later. <u>Id.</u> at *2. During this second interrogation,

the defendant was read a <u>Miranda</u> warning and waived his rights. <u>Id.</u> Then, approximately six hours later, the defendant was interrogated a third time. A different set of officers told the defendant they were aware he had previously been read his rights, and mostly questioned the defendant about an unrelated crime. <u>Id.</u> A Magistrate Judge held that the defendant's statements at this third interrogation were admissible, reasoning that the defendant had "never . . . invoked his right to remain silent" after being Mirandized, and that the third interrogation involved "material changes in time, place, personnel and topic." <u>Id.</u> at *6.

<u>Johnson</u>, of course, is not binding authority. It is also clearly distinguishable. Here, far fewer than six hours passed between Defendant's first and second interrogations. Officer Santa, who was present at Defendant's traffic stop, conducted the second interrogation. And the second interrogation focused on exactly the same conduct as the first. In these circumstances, the absence of a second <u>Miranda</u> warning weighs heavily against the Government.[8]

<u>Mosley</u>'s final factor—whether "once the interrogation resumed, [Defendant] was questioned by a different officer about an unrelated crime"—also favors Defendant. <u>Gore</u>, 492 F.3d at 1297. The Government correctly notes that Special Agent Gray conducted Defendant's first interrogation, and Officer Santa

---

[8] As explained below, this case is further distinguished from <u>Johnson</u> by the fact that Defendant invoked his right to remain silent at the start of his second interrogation.

conducted the second. Dkt. No. [1008] at 6. But Officer Santa had advised Defendant of his Miranda rights at the scene of the traffic stop and was close by during Special Agent Gray's questioning: As Defendant sat in the rear of Officer Santa's patrol car, Officer Santa sat in the driver's seat. Dkt. No. [868] at 123–24. And the Government does not contest that Officer Santa and Special Agent Gray focused their questioning on the same offenses.

The Government points out that it is possible to find a suspect's right to silence has been scrupulously honored even when the fourth factor is not satisfied. Dkt. No. [1008] at 6. It is true that the presence or "absence of a single *Mosley* factor is [not] dispositive; rather, [the] inquiry looks to the circumstances as a whole." Gore, 492 F.3d at 1298–99. Here, however, the totality of the circumstances do not reflect "careful[] observ[ation]" of the "procedural safeguards of *Miranda*." Singletary, 952 F.2d at 1293. Defendant's second interrogation appears to have occurred after roughly the minimum allowable period of time. When it commenced, Defendant heard confusing information about his Miranda rights and multiple explicit admonitions to speak. The interrogation concerned the same offense about which he was questioned at the traffic stop and was conducted by the officer who Mirandized him the first time. Considering this evidence as a whole, the Court agrees with the Magistrate Judge that officers did not scrupulously honor Defendant's invocation of his right to remain silent. Consequently, Defendant's statements to Officer Santa at the APD precinct must be suppressed.

Separately, the Magistrate Judge correctly found that Defendant invoked his right to silence as Officer Santa began to question him. Defendant did not sit idle when Officer Santa asked if he would talk. Cf. Berghuis v. Thompkins, 560 U.S. 370, 382 (2010) (no invocation when defendant made no affirmative statement expressing a desire to remain silent). Instead, he said, "I can't," and repeated that answer moments later. Dkt. No. [1000-2] at 0:30–38. The Government argues the words "I can't" are equivocal but does not cite cases directly on point. Instead, the Government points to examples of defendants using a double-negative ("I ain't saying nothing") or explaining they did not want to speak because of potential consequences ("[I] might get in too much trouble"). See Dkt. No. [1008] at 4 n.2. Here, Defendant did not qualify his statement or equivocate. Neither his choice of words nor the context of those words indicate a willingness to speak. See Medina, 59 F.3d at 1104–05 (holding that courts must consider the context of a defendant's purported invocation). In short, Defendant's repetition of "I can't" "articulate[d] his desire with sufficient clarity that a 'reasonable police officer in the circumstances would understand the statement to be a request' . . . to cease further questioning." United States v. Ochoa, 941 F.3d 1074, 1098 (11th Cir. 2019) (quoting Davis v. United States, 512 U.S. 452, 459 (1994)). For this independent reason, Defendant's statements to Officer Santa during the second interrogation should be suppressed.

## IV. CONCLUSION

In light of the foregoing, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation [997] as the opinion of this Court. Defendant's Motion to Suppress Evidence [317] is **DENIED** and Motion to Suppress Statements [318] is **GRANTED**.

**IT IS SO ORDERED** this 14th day of July, 2021.

**Leigh Martin May**
**United States District Judge**